UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

DEBORAH COTTER, individually,
and as representative of a Class of
Participants and Beneficiaries, on Behalf
of the Matthews International Corporation
401(k) Plan,

        Plaintiff,

        v.

MATTHEWS INTERNATIONAL
CORPORATION,

        and

THE BOARD OF DIRECTORS OF
MATTHEWS INTERNATIONAL
CORPORATION,

        and

PENSION BOARD OF MATTHEWS
INTERNATIONAL CORPORATION

        and

JOHN DOES 1-30,

        Defendants

Case No. 20-cv-1054

**CLASS ACTION COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)**

## COMPLAINT

COMES NOW Plaintiff, Deborah Cotter, individually and as representative of a Class of

Participants and Beneficiaries on behalf of the Matthew International Corporation 401(k) Plan (the

"Plan"),[1] by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1.    The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).[2]

2.    The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.") It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.    Defendants, Matthews International Corporation ("Matthews International"), the Board of Directors of Matthews International Corporation ("Board Defendants"), Pension Board

---

[1]    The Plan is a legal entity that can sue and be sued. 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather pursuant to 29 U.S.C. § 1109(a), and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2]    Unless indicated otherwise, cited and quoted cases are omitted.

of Matthews International Corporation ("Pension Board"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Matthews International Corporation 401(k) Plan ("The Plan") – that it sponsors and provides to its employees.

4.      Plaintiff alleges that during the putative Class Period (July 13, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping; (2) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs, and/or better performance histories.

5.      In addition, for mutual funds share classes available within the Plan, the same issuer offered a different share class from that selected by the Plan that charged lower fees, and consistently achieved higher returns. Defendants, however, inexplicably failed to select these lower fee-charging and better-return producing share classes. The Plan also generally chose more costly "actively managed funds" rather than "index funds" that offered equal or better performance as substantially lower cost. Additionally, the administrative fees charged to Plan participants were consistently greater than the fees of most comparable 401(k) plans, when fees are calculated as cost per participant.

6.      These investment options and unreasonable fees cannot be justified.  Defendants' failure to monitor and improve investment options confirms more than simply sloppy business practice. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan

participants and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor administrative fees against applicable benchmarks and peer groups to identify unreasonable and unjustifiable fees.

7.     To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

<u>JURISDICTION AND VENUE</u>

8.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

9.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

10.     Venue is appropriate in this district because the Defendants and Plaintiff may be found in this judicial district within the meaning of 29 U.S.C. § 1132(e)(2).

11.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

<u>PARTIES</u>

12.     Plaintiff, Deborah Cotter, is a resident of the State of Wisconsin and currently resides in Neenah, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

13.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to

receive benefits in the amount of the difference between the value of her account as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described within this Complaint.

14.     The named Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent or unreasonable investment and fee options in the Plan. Defendants' selection and retention of these options resulted in higher administrative fees than the Plan and its participants and beneficiaries should have paid, as well as poorer net investment performance, had Defendants satisfied their fiduciary obligations. All participants and the Plan continue to be harmed by the ongoing inclusion of these investment options.

15.     Matthews International Corporation ("Matthews International") is a company with its principal headquarters located at Two Northshore Center, Pittsburgh, PA 15212. In this Complaint, "Matthews International" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

16.     Matthews International is comprised of three business segments: SGK Brand Solutions provides services including creative design through artwork production, merchandising, reprography and tooling; Matthews Memorialization provides products, business solutions, technology services to customers that include cemeteries, funeral homes, monument dealers, and sign shops across the United States and in other countries around the world; and Matthews Industrial Technologies provides product identification equipment, consumables, and warehouse automation systems.[3]

17.     Matthew International acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and

---

[3]         https://www.matw.com/about

scope of their business. Matthews International appointed other Plan fiduciaries, including the Pension Board of Matthews International Corporation, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Matthews International is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

18. The Plan Administrator of the Matthews International Corporation 401(k) Plan is the Pension Board of Matthews International Corporation ("Pension Board"), located at Two Northshore Center, Pittsburgh, Pennsylvania 15212.

19. The Pension Board is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Pension Board has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Pension Board has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

20. The Pension Board and members of the Pension Board during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Pension Board Defendants."

21. To the extent that there are additional officers and employees of Matthews International who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Matthews International officers and

employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

22.     The Plan is a "defined contribution" pension plan under 29 U.S.C. § 1102(2)(A) and 1002(34), meaning that Matthews International's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

23.     The Plan has about $300,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

## ERISA'S FIDUCIARY STANDARDS

24.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25.     With certain exceptions not relevant here, 29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

26.     29 U.S.C. § 1109 provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

27.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

28.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments).

Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007); (emphasis original); 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

29.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

30.     29 U.S.C. § 1132(a)(2) authorizes plan participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

## THE PLAN

31.     Started on January 1, 1997, the Plan has had almost 6,000 participants and assets around $300,000,000 since the year 2014. At the end of 2018, the Plan had approximately 5,889 participants and approximately $308,785,440 in assets. At different times, the Plan offered about twenty-five (25) different investment choices to its participants.

32.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The excessive fees led to lower net returns than participants enjoyed in comparable 401(k) plans.

33.    During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan participants, by: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost, and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories. Defendants also failed to use the lowest cost share class for many of the mutual funds within the Plan.

34.    Defendants' mismanagement of the Plan, to the detriment of Plan participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104.

A.    **Excessive Plan Expenses**

35.    There are commercially available programs commonly used by financial advisors and plan fiduciaries to analyze plans' performance, comparative costs and other key indicators.

36.    The commercially available programs obtained information from a combination of public sources such as the IRS, DOL and SEC, and are believed to be accurate during the Class period.  However, many plans change options over the class period and the underlying information submitted to the federal government, in the 5500 Form, is often incomplete or contains errors. Nevertheless, the information obtained in these programs validates that Defendants engaged in fiduciary breaches.

37.    Despite the overwhelming evidence that expenses matter and that a fiduciary is obligated to consider expenses in making investment decisions, Defendants did not have a viable methodology for monitoring the expenses of the funds in its Plan. Not only did Defendants maintain a menu of high-fee funds, but Defendants also excluded low-fee index funds.

38.     The recordkeeper during the Class Period, Wells Fargo Bank, N.A. ("Wells Fargo") is well known as a high cost recordkeeper and administrator and tends to have platforms that encourage higher fee funds.

39.     During the Class Period (from July 13, 2014 through the date of judgment), Defendants maintained an investment platform that contained a stable value fund, two different self-directed brokerage accounts, 11 Target Date funds, 10 additional active mutual funds, and 4 index mutual funds.

**B.      Failure to Monitor the Plan's Recordkeeping Expenses**

40.     The Plan's recordkeepers during the Class Period was Wells Fargo. The term "recordkeeping" is a catchall term for the administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."

41.     Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services, including claims processing, trustee services, participant education, managed account services, participant loan processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, and loan processing, are often a profit center for recordkeepers.

42.     The market for recordkeeping is highly competitive. As a result of such competition, vendors vigorously compete for business by offering the best price.

43.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

44.     Recordkeeping expenses can be paid by the plan sponsor (the employer) directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide. Best practice is for the Plan to pay for the expenses directly like they do in a defined benefit plan.

45.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharingand-invisible-fees (last visited May 17, 2020).

46.     According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined*

*Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").

47. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

48. First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

49. Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

50.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

51.     Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.  There is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was unreasonable.

52.     Specifically, Matthews International paid higher recordkeeping fees to both Wells Fargo and the former recordkeeper, PNC in the years 2014, 2015, and 2016. The disclosed record keeping fees from the years 2014 to 2018 were as follows:

| Year | Recordkeeper | Total Fees | Total Participants | Cost Per Participant |
|------|--------------|------------|--------------------|-----------------------|
| 2018 | Wells Fargo | $291,226 | 5,889 participants | $49 |
| 2017 | Wells Fargo | $234,911 | 3,146 participants | $75 |
| 2016 | PNC | $263,697 | 3,180 participants | $83 |
| 2015 | PNC | $249,666 | 3,247 participants | $77 |
| 2014 | PNC | $298,899 | 3,143 participants | $95 |

53.     Recordkeeping costs are almost certainly higher due to undisclosed revenue sharing arrangements. Wells Fargo disclosed the above per participant recordkeeping costs during the Class Period in their Form 5500. Wells Fargo also checked the box that they charge fees in addition to these recordkeeping fees that they chose not to disclose.

54.     Wells Fargo is probably the most fined financial institution in United States history paying out approximately $3,000,000,000 for fraud in its sales practices in 2020.[4]

55.     More specifically, in the year 2018, Wells Fargo Advisors was one of a number of firms paying over $17,000,000 in fines to the SEC for putting investors in higher fee mutual fund share classes.[5]

56.     Wells Fargo's own employees have sued them for excessive fees in their 401(k) plan a number of times.[6] Wells Fargo has also been known to charge 30 basis points in hidden platform support fees.[7] Further discovery will determine whether that is the case here.

57.     In all, the total amount of recordkeeping fees paid by Defendants to Wells Fargo and PNC through the Class Period on a per participant basis was astronomical. Based on Plaintiffs' investigation and analysis, normal recordkeeping fees for a $250 to $500 million-dollar plan with less than 12,000 participants should have been less than $50 per participant at the beginning of the Class Period, and then lower in ensuing years as a reflection of the general trend of decreasing recordkeeping fees.

---

[4]     https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices

[5]     https://www.sec.gov/litigation/admin/2019/ia-5199.pdf

[6]     https://www.investmentnews.com/wells-fargo-sued-again-for-using-in-house-funds-in-401k-plan-72753; https://s3.amazonaws.com/si-interactive/prod/plansponsor-com/wp-content/uploads/2020/03/17152751/BeckervWellsFargoComplaint.pdf

[7]     https://advisorhub.com/wells-fargo-raises-some-revenue-sharing-fees-for-asset-managers

58. In a recent Complaint, it was stated that for plans over $100,000,000, $54.00 per participant was excessive. A 1998 DOL Study suggests that plans over 1,000 participants can expect record keeping costs of $34 a head. A recent 2016 competitive bid by Nike with over 25,000 participants was $21.00 per person. *See also Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37.00 to $42.00).

59. Recording keeping fees were excessive during the Class Period, and breached Defendants' fiduciary duties to Plaintiff and members of the Class to act in their best interest and like a prudent fiduciary should have under like circumstances.

### C.     The Plan Paid Unreasonably High Fees for Share Classes

60. Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets. There is no material difference between share classes other than costs – the funds hold identical investments and have the same manager.

61. Larger defined contribution plans such as the Plan have sufficient assets to qualify for lower cost share classes. Even when a plan does not meet the investment minimum to qualify for the cheapest available share class, it is well known among institutional investors that mutual fund companies will waive those investment minimums for a larger plan adding the fund in question as an investment alternative.

62. Fiduciaries to large defined contribution plans, such the Plan, can and should use its asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent plan fiduciaries will search for and select the lowest-priced share class available.

63. "Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the manner that is reasonable and appropriate to the particular investment action and strategies involved … would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble v. Edison International,* 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017).

64. The fact that not using the lowest fee share class was a fiduciary liability was well known during the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of, and subsequently utilize, lowest-cost share classes as an "egregious fiduciary breach" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENT NEWS (Feb. 18, 2016).

65. Additionally, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the higher fee class investment were the same as the fees charged by the lower fee class investment, net of the revenue sharing/revenue rebating (crediting) paid by the funds to defray the Plan's recordkeeping costs.

66. Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing," *Tibble v. Edison International*, 2017 U.S. Dist. LEXIS 130806, *11 (C.D. Cal. Aug. 16, 2017), or revenue rebating (crediting). Aside from it being completely unnecessary for a plan of this size, revenue sharing/rebating (crediting) immediately shifts all the fees to the Plan participants (to the detriment of participant returns). The failure to

adhere to this basic tenet of good fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative fee arrangements put in place by Defendants.

67.     There are two major share class violations from the years 2017 to 2019:

| | | | |
|---|---|---|---|
| American Beacon Small Cap Value I (AVPAX) | 114bps | AASRX | 80bps |
| American Century Mid Cap Value Inst (ACMVX) | 98bps | AMDVX | 63bps |

68.     At all times during the Class Period, Defendants knew or should have known about the existence of cheaper share classes and should have immediately recognized the prudence of transferring the Plan funds into these alternative investments. A prudent fiduciary conducting an impartial review of the Plan's investments would have conducted such a review on at least a quarterly basis, would have identified the cheaper share classes available and transferred the Plan's investments into institutional shares at the earliest opportunity.

69.     There is no good faith explanation for using high-cost share classes when lower-cost share classes are available for the same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher cost for Plan participants.

**D.     <u>Failure to Use Lower-Cost, Passively Managed Funds</u>**

70.     As noted above, ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

71.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively managed index fund, over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market? Hardly, The Washington Post,

available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also* Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

72.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); see also Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

73.    The case for indexing was greatly enhanced by *Brotherston v. Putnam Investments, LLC,* No. 17-1711 (1st Cir. 2018), which stated: *"*So to determine whether there was a loss, it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so." (citing Restatement (Third) of Trusts, § 100 cmt. b(1)).

74.    Matthews International made a major overhaul of investment options during the year 2017. Upon information and belief, a major portion of the plans prior to the year 2017 were T. Rowe Price Target Date Funds in high fee share classes.

75.     During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart below demonstrates that the expense ratios of the Plan's investment options between the years 2014 to 2020 were more expensive by significant multiples of comparable passively managed and actively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

76.     The following chart also identifies the funds selected by Matthews International under the influence of the Wells Fargo, when it was the recordkeeper to the Plan from the year 2017 forward.  The chart further illustrates the broad market indices for the investment options. An appropriate low-cost for the same benchmark is included, which can be used to measure the excessive fees and related underperformance of the Defendants' funds.

77.     The Plan Fees that follow are expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund share class deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (or bps). (One basis point is equal to 1/100th of one percent (or 0.01%). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors. The expense ratios of each fund are recognized by Morningstar as the single most important consideration in fund selection, which is the starting point for analyzing the prudence of Defendants' fund selection process.

## LOW COST ALTERNATIVES AVAILABLE TO THE PLAN

| Fund in Plan | Net Expense Ratio | Passive Alternative | Net Expense Ratio | Excess Fee % |
|---|---|---|---|---|
| Wells Fargo Stable Value N | 56 | Putnam Stable Value 15 CIT | 30 | 87% |
| Baird Aggregate Bond Inst. (BAGIX) | 30 | State Street Aggregate Bond Index (SSAFX) | 3 | 900% |

| | | | | |
|---|---|---|---|---|
| Loomis Sayles Bond Inst. (LSBDX) | 67 | State Street Aggregate Bond Index (SSAFX) | 3 | 2133% |
| American Funds Target Date Ret 2010 R6 (RFTTX) | 31 | Vanguard Target Retirement  2010 Fund (VTENX) | 13 | 138% |
| American Funds Target Date Ret 2015 R6 (RFJTX) | 31 | Vanguard Target Retirement  2015 Fund (VTXVX) | 13 | 138% |
| American Funds Target Date Ret 2020 R6 (RFCTX) | 31 | Vanguard Target Retirement  2020 Fund (VTWNX) | 13 | 138% |
| American Funds Target Date Ret 2025 R6 (RFDTX) | 33 | Vanguard Target Retirement  2025 Fund (VTTVX) | 13 | 154% |
| American Funds Target Date Ret 2030 R6 (RFETX) | 35 | Vanguard Target Retirement  2030 Fund (VTHRX) | 13 | 169% |
| American Funds Target Date Ret 2035 R6 (RFFTX) | 37 | Vanguard Target Retirement  2035 Fund (VTTHX) | 14 | 164% |
| American Funds Target Date Ret 2040 R6 (RFGTX) | 38 | Vanguard Target Retirement  2040 Fund (VFORX) | 14 | 171% |
| American Funds Target Date Ret 2045 R6 (RFHTX) | 38 | Vanguard Target Retirement  2045 Fund (VTIVX) | 15 | 153% |
| American Funds Target Date Ret 2050 R6 (RFITX) | 39 | Vanguard Target Retirement  2050 Fund (VFIFX) | 15 | 160% |
| American Funds Target Date Ret 2055 R6 (RFKTX) | 40 | Vanguard Target Retirement  2055 Fund (VFFVX) | 15 | 167% |

| | | | | |
|---|---|---|---|---|
| American Funds Target Date Ret 2060 R6 (RFUTX) | 41 | Vanguard Target Retirement 2060 Fund (VTTSX) | 15 | 173% |
| American Beacon Small Cap Value I (AVPAX) | 114 | Vanguard Small Cap Value Index Inst. (VSMVX) | 8 | 1325% |
| American Century Mid Cap Value Inst. (ACMVX) | 98 | Vanguard Mid-Cap Value Index Fund Inst. (VMCIX) | 4 | 2350% |
| Conestoga Small Cap Institutional (CCALX) | 90 | Vanguard Small-Cap Growth Inst. (VSGIX) | 6 | 1400% |
| Invesco Diversified Dividend R6 (LCEFX) | 42 | Vanguard Value Index Inst. (VIVIX) | 4 | 950% |
| MFS Growth R6 (MFEKX) | 67 | Vanguard Russell 1000 Growth Index Fund Inst. (VRWGX) | 7 | 857% |
| PNC Bank Multi Factor Small Cap Core I MFS Growth R6 (PLOIX) | 85 | Vanguard Small-Cap Index Fund Inst. (VSCIX) | 4 | 2025% |
| Principal MidCap Institutional (PCBIX) | 69 | Vanguard Mid-Cap Index Fund Inst. (VMCIX) | 4 | 1625% |
| American Funds Europacific Growth R6 (RERGX) | 49 | Vanguard FTSE xUS Index (VFWSX) | 8 | 513% |

78.     The above is for illustrative purposes only. The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

79.     The Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones. As noted above, while higher-cost mutual funds may outperform a less-

expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term. With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.

80.     Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

81.     Plaintiff had no knowledge of Defendants' process for selecting investments and monitoring them to ensure they remained prudent. Plaintiff also had no knowledge of how the fees charged to and paid by the Plan participants compared to any other funds. Nor did Plaintiff know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants did not offer because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

82.     Plaintiff did not individually select funds for her 401(k) Plan, but instead selected an approach based on risk and then her portfolio was constructed by Defendants, with the help of the recordkeeper and/or consultants.

83.     By selecting and retaining the Plan's unreasonably expensive cost investments while failing to adequately investigate the use of lower cost share classes, offered by the same investment companies, or superior, lower-cost mutual funds from other fund companies that were readily available to the Plan, Defendants caused Plan participants to lose millions of dollars of their retirement savings through unreasonable fees.

E.     **Stable Value Funds**

84.     Stable value funds are fairly common in 401(k) plans. In most cases, stable value products make use of special guaranteed investment contracts known as "GIC" or "wraps" that have their own risk and return characteristics. Stable value funds are not offered as mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic GIC-based fund, typically in a Collective Investment Trust ("CIT"). The differences between the different types of funds are critical from a fiduciary standpoint.

85.     A stable value account in a DC retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that it provides consistent returns over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – intermediate – term bond fund. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with funds.[8]

86.     There are several different types of stable value accounts in the 401(k) marketplace. Large plans overwhelmingly offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying

---

[8]     The key difference between a GIC and a wrap contract is that under a wrap contract the associated invested assets are usually owned outright by the plan in a synthetic GIC structure or segregated in the plan's name in an insurance separate account wrap.

funds. The 401(k) market has been slower to accept synthetic-based stable value funds due to some regulatory interpretations, but one major provider has this option for 401(k) plans like Matthews International's. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently should offer the highest rates.

87.     The Wells Fargo stable value option is a synthetic based collective investment trust. The main Wells Fargo Stable Return Fund N product had $33,837,788 as of the end of the year 2018. It is a substantial holding of the plan and there are other almost identical products from other vendors like Putnam and Vanguard at lower fees. This is especially concerning given the conflicts of interest with Wells Fargo's role as recordkeeper.

88.     Defendants had the opportunity and duty to evaluate this investment in advance; this is not a case of judging an investment with the benefit of hindsight. As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the insurance companies' stable value fund and to remove or replace it where a substantially identical investment option could be obtained from the same provider at a lower cost. *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected.").

## THE OVERCHARGES BREACHED
## DEFENDANTS' FIDUCIARY OBLIGATIONS TO THE PLAN

89.     The administrative fees of the investment offerings were paid for by the Plan participants. Defendants, as fiduciaries, were responsible for ensuring that these administrative fees were reasonable.

90.     A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

91.     At retirement, employees' benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses. Accordingly, unreasonable fees can impair the value of a participant's account. Over time, even small differences in fees and performance can result in large differences in the amount of savings available at retirement.

92.     Prudent fiduciaries exercising control over administration of a plan and the selection and monitoring of designated investment alternatives will take steps to minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. *See,* Restatement (Third) of Trusts § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function. . . .").

93.     Additional fees of between 0.2% to 0.4%, as an example, can significantly affect a participant's investment over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d

1187, 1190 (9th Cir. 2016); *id.* at 1198 (stating that, "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks…").

94.     The duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law.

95.     Given the significant variation in total plan fees attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparison to other similarly-sized plans. 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character").

96.     A fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants. A plan fiduciary cannot assume that an investment that began as a prudent one will remain so, particularly when the original circumstances change, or the investment reveals itself to be deficient. An ERISA fiduciary's investment decisions also must account for changed circumstances and a trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.

97.     As illustrated above, the Plan's administrative fees could in many cases be significantly reduced simply by electing a different share class offered by the same issuer, or substantially identical fund from a different issuer, and are consistently well above its comparator peers, regardless whether the comparison is based on cost per participant or percentage of assets.

98.     Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether investments will outperform their benchmark net of fees. Prudent fiduciaries

then make a reasoned decision as to whether it is in participants' best interest to offer specific funds or share classes for the particular investment style and asset class.

99.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options.

100.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the introduction of independent research companies such as Morningstar, which sort mutual funds of all categories "based on the underlying securities in each portfolio… We place funds in a given category based on their portfolio statistics and compositions over the past three years." www.morningstar.com/InvGlossary/Morningstar_category.aspx.

101.     Defendants are not a prudent fiduciary of the Plan because they did not make a reasoned decision to offer specific funds or share classes to the Plan participants as described herein.

102.     Defendants are not a prudent fiduciary because they failed to continuously monitor the investment performance of its plan options against applicable benchmarks and peer groups, and they failed to identify and replace underperforming investments with better-performing and reasonably priced options.

103.     Investment options should not favor the fund provider over the Plan's participants. Yet here, to the detriment of the Plan and its participants and beneficiaries, Defendants included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise not justified based on their economic value to the Plan.

104. Based on reasonable inferences from the facts set forth herein, during the Class Period Defendants failed to have an independent system of review in place to ensure that the Plan participants were charged appropriate and reasonable fees for the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

## CLASS ACTION ALLEGATIONS

105. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

106. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Matthews International Corporation 401(k) Plan beginning six years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

107. The Class includes near 6,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

108. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

109.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

110.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

111.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

112.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

113.    Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

114.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a plan for breaches of fiduciary duty.

115.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

116.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decision – doesn't exist here because courts will not defer to plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF – BREACH OF DUTIES OF LOYALTY AND PRUDENCE

117.    Plaintiff restates the above allegations as if fully set forth herein.

118.    Defendants are a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1). They are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plan's

investments on an ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble I,* 135 S. Ct. at 1829.

119.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan. The scope of the fiduciary duties and responsibilities of Defendants include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These duties further required Defendants to independently assess whether each option was a prudent choice for the Plan. *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

120.     Defendants were directly responsible for ensuring that the Plan's fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

121.     Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

122.     Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer unreasonably expensive funds and share classes compared to equivalent and/or

comparable low-cost alternatives that were available to the Plan. Through these actions and omissions, Defendants failed to discharge its duties with respect to the Plan in violation of its fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

123.     Defendants failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

124.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### SECOND CLAIM FOR RELIEF – FAILURE TO ADEQUATELY MONITOR OTHER FUDICIARIES

125.     Plaintiff restates the above allegations as if fully set forth herein.

126.     Defendants had the authority to appoint and remove members of the Pension Board and were aware that these fiduciaries had critical responsibilities for the Plan.

127.     In light of this authority, Matthews International had a duty to monitor the Pension Board to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

128.     Matthews International also had a duty to ensure that the Pension Board members possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and

information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Matthews International.

129.     Matthews International breached its fiduciary duties by, among other things:

    a.     Failing to monitor and evaluate the performance of the Pension Board or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of fund's class of shares, and inefficient fund management styles that adversely affected the investment performance of the funds' and their participants' assets as a result of the Pension Board's imprudent actions and omissions;

    b.     Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

    c.     Failing to remove Pension Board members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

130.     As the consequences of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Matthews International complied with their fiduciary obligations, the Plan would not have suffered the losses, and Plan participants would have had more money available to them in retirement.

131.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Matthews International is liable to restore to the Plan all loses caused by their failure to adequately monitor the Pension Board. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.      An Order requiring the Defendant Matthews International to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Matthews International as necessary to effectuate said relief, and to prevent Matthews International's unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Dated this 13th day of July, 2020

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ *Paul M. Secunda*
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
15850 W. Bluemound Rd., Suite 304
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com