UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

DEBORAH COTTER, individually,
and as representative of a Class of
Participants and Beneficiaries, on Behalf
of the Matthews International Corporation
401(k) Plan,

        Plaintiff,

        v.

MATTHEWS INTERNATIONAL
CORPORATION,

        and

THE BOARD OF DIRECTORS OF
MATTHEWS INTERNATIONAL
CORPORATION,

        and

PENSION BOARD OF MATTHEWS
INTERNATIONAL CORPORATION

        and

JOHN DOES 1-30,

        Defendants

Case No. 20-cv-1054

**CLASS ACTION AMENDED
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)**

---

## AMENDED COMPLAINT

---

COMES NOW Plaintiff, Deborah Cotter, individually and as representative of a Class of

Participants and Beneficiaries on behalf of the Matthew International Corporation 401(k) Plan (the

"Plan"), by her counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges

and asserts to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1.     The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.     The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments *as well as* a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan;" 29 C.F.R. §2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment." It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan." *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.     Defendants, Matthews International Corporation ("Matthews International"), the Board of Directors of Matthews International Corporation ("Board Defendants"), Pension Board of Matthews International Corporation ("Pension Board"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the Matthews International Corporation 401(k) Plan ("The Plan") – that it sponsors and provides to its employees.

4. Plaintiff alleges that during the putative Class Period (July 13, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. §1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping and administration (RK&A); (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs.

5. These objectively unreasonable RK&A fees and investment selections cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RK&A and investment management.

6. To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Deborah Cotter, is a resident of the State of Wisconsin and currently resides in Neenah, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12.     In approximately January 2018, Plaintiff commenced employment with Matthews International in Customer Service at their Appleton, Wisconsin facility.

13.     On or about June 23, 2020, Plaintiff's employment with Matthews International ended.

14.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered an actual injury to her own Plan account in which she is still a Participant, that injury is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

15.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiff personally suffered injury, as that turns on ERISA §502(a)(2) on which his claim rests. This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA §409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiff, may proceed under ERISA §502(a)(2) on behalf of the Plan and all participants in the Plan.  Plaintiff may seek relief under ERISA §502(a)(2) that sweeps beyond his own injury and beyond any given investment he has held as a Participant in the Plan.

16.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions made with regard to the Plan.

17.     The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RK&A fees, investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

18.     The named Plaintiff and all participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans.

19.     Matthews International Corporation ("Matthews International") is a company with its principal headquarters located at Two Northshore Center, Pittsburgh, PA 15212. In this

Complaint, "Matthews International" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

20.     Matthews International is comprised of three business segments: SGK Brand Solutions provides services including creative design through artwork production, merchandising, reprography and tooling; Matthews Memorialization provides products, business solutions, technology services to customers that include cemeteries, funeral homes, monument dealers, and sign shops across the United States and in other countries around the world; and Matthews Industrial Technologies provides product identification equipment, consumables, and warehouse automation systems.

21.     Matthew International acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Matthews International appointed other Plan fiduciaries, including the Pension Board of Matthews International Corporation, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Matthews International is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

22.     The Plan Administrator of the Matthews International Corporation 401(k) Plan is the Pension Board of Matthews International Corporation ("Pension Board"), located at Two Northshore Center, Pittsburgh, Pennsylvania 15212.

23.     The Pension Board is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Pension Board has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Pension Board has exclusive responsibility and complete discretionary authority to control the

operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

24.     The Pension Board and members of the Pension Board during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Pension Board Defendants." To the extent that there are additional officers and employees of Matthews International who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Matthews International officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

25.     The Plan is a "defined contribution" pension Plan under 29 U.S.C. §1102(2)(A) and 1002(34), meaning that Matthew International's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

26.     The Plan currently has about $309,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt

to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

27.     With 5,231 participants in the year 2018, the Plan had more participants than 99.66% of the defined contribution Plans in the United States that filed 5500 forms for the 2018 Plan year. Similarly, with $308,785,440 in assets in the year 2018, the Plan had more assets than 99.59% of the defined contribution Plans in the United States that filed 5500 forms for the 2018 Plan year.

## ERISA'S FIDUCIARY STANDARDS

28.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the Plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29.     With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

> [T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

30.     29 U.S.C. §1109 provides in relevant part:

> Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

31.     Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

32.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

33.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

34.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

35.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a plan are referred to as "Participants."

### Recordkeeping and Related Administrative Services

36.     Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services. Defendants received a standard package of RK&A services.

37.     Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

38.     The market for defined contribution recordkeeping services is highly competitive,

particularly for a Plan like Defendants' with large numbers of participants and large amounts of assets.

39.    Since at least the mid-2000s, the fee that RK&A service providers have been willing to accept for providing RK&A services has decreased.

40.    The underlying cost to a recordkeeper of providing the RK&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

41.    The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another and is generally not dependent on the balance of the participant's account.

42.    Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

43.    Therefore, while the total cost to a provider for RK&A services increases as more participants join the Plan, the cost per participant to deliver the services decreases.

44.    Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RK&A providers.

45.    Since at least the early 2000s, Defendants should have been aware of this cost

structure dynamic for RK&A providers.

46.     Sponsors of defined contribution plans contract for RK&A services separately from any contracts related to the provision of investment management services to plan participants.

47.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services that the recordkeeper provides on behalf of the investment manager, e.g., RK&A services.

48.     As a result, RK&A service providers often make separate contractual arrangements with mutual fund providers. For example, RK&A providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund.

49.     The fees described in the aforementioned paragraph are known in the defined contribution industry as "revenue sharing."

50.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RK&A provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

51.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RK&A services and, in some cases, other services provided to the Plan. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

52.     In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

53.     In the context of defined contribution plans, when multiple share classes of a mutual fund are available to a retirement plan, the share class that provides the lowest Net Investment Expense to Retirement Plans is often referred to as the "Most Efficient Share Class."

54.     Providers of Retirement Plan Services, including RK&A services, typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

55.     Regardless of the pricing structure that the Plan Fiduciary negotiates with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

56.     As a result, plan Fiduciaries must understand the total dollar amounts paid to their RK&A provider and be able to determine whether the compensation is reasonable by understanding what the market is for the RK&A services received by the Plan.

57.     Because RK&A fees are actually paid in dollars and because of the cost dynamic noted in the aforementioned paragraphs, the fees paid for RK&A services are evaluated and compared on a dollar per participant basis.

58.     It is well known among retirement Plan consultants and advisors (who often act as co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a Plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

59.     During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

60.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant fee when evaluated on a per participant basis.

**Investments**

61. Plan Fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

62. The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

63. In selecting different investment options to make available to Plan Participants, the Plan Fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

65. Accordingly, the primary focus when choosing an active investment option to make available to Plan Participants is the skill of the portfolio manager. In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes. When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, RK&A services.

66. As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the lowest Net Investment Management Expense to Retirement Plans.

## THE PLAN

67.     Started on January 1, 1997, the Plan now has over 5,000 participants and assets of approximately $309,000,000. More specifically, at the end of the year 2018, the Plan had approximately 5,231 participants and approximately $308,785,440 in assets.

68.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The fees were also excessive relative to the RK&A services received. These excessive fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

69.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan Participants, by: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) by failing to monitor the RK&A fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the plan to pay objectively unreasonable and excessive RK&A fees, relative to the RK&A services received.

70.     Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

71.     A Plan Fiduciary is required to fully understand all sources of revenue received by its RK&A service provider/recordkeeper. It must regularly monitor that revenue to ensure that the

compensation received by the recordkeeper is and remains reasonable for the services provided.

72. Prudent Plan Fiduciaries ensure they are paying only reasonable fees for RK&A services by soliciting competitive bids from other service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process and is performed regularly by prudent Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service providers. For Plans with as many participants as Defendants' Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

73. Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

74. Having received bids, the prudent Plan Fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee.

75. Prudent plan Fiduciaries follow this same process to monitor the fees of retirement Plan advisors and/or consultants as well as any other covered service providers.

76. After the revenue requirement is negotiated, the plan Fiduciary determines how to pay the negotiated RK&A fee. The employer/Plan Sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay the recordkeeping fee instead. If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant

accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

77. In other words, if the Plan negotiates a per participant revenue threshold, e.g., $45.00, the Plan does not need to require that each participant pay $45.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the RK&A fee pro rata to participants. For example, a 10,000-participant Plan with a $45.00 revenue threshold would pay $450,000 for RK&A services. If the Plan had $450,000,000 in assets, then the $450,000 would work out to 10 basis points. Accordingly, the Plan Fiduciary could allocate the $450,000 to Plan Participants by requiring that each participant pay 10 basis points.

78. In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the RK&A services provided by the recordkeeper do not change but, because of market appreciation and contributions to the Plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

79. Regardless of the pricing structure negotiated by the Plan Fiduciary, the Plan Fiduciary must ensure that the fee paid to the recordkeeper for RK&A services is reasonable for the level of services provided.

80. All of these standards were accepted and understood by prudent Plan Fiduciaries, including Defendants, at all times during the Class Period.

81. For example, fiduciary best practices based on DOL guidelines, case law, and

marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
>
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
>
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
>
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year. . . .
>
> 7. Review services annually to identify opportunities to reduce administrative costs.[1]

82.     Defendants' recordkeepers during the Class Period were PNC Bank ("PNC") (2014-2016) and Wells Fargo Bank, N.A. ("Wells Fargo") (2017-2020), both of which are well-known providers of RK&A services.

83.     Prudent fiduciaries implement three related processes to prudently manage and control a Plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

84.     First, a Plan Fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A hypothetical prudent Fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

---

[1] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

85.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a Plan, a prudent hypothetical Fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the Plan's recordkeeper. To the extent that a Plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the Plan and its Participants.

86.     Third, a hypothetical plan Fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other Plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the Plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three (3) years as a matter of course, and more frequently if the Plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar Plans.

87.     By merely soliciting bids from other providers a prudent Plan Fiduciary can quickly and easily gain an understanding of the current market for similar RK&A services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RK&A FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RK&A FEES

88. A Plan Fiduciary must continuously monitor its RK&A fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

89. During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to PNC and Wells Fargo.

90. During the Class Period, Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to PNC and Wells Fargo.

91. During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to PNC and Wells Fargo, in order to avoid paying objectively unreasonable fees for RK&A services.

92. Defendants waited at least three years (from 2014 to 2017) to replace PNC, which had been charging objectively unreasonable fees for RK&A services. Defendants should have replaced PNC earlier in the Class Period as a recordkeeper when it became clear that Defendants were paying objectively unreasonable fees for RK&A services. Wells Fargo, from 2017 to 2020, also charged objectively unreasonable RK&A fees and should have never been selected to replace PNC and should have been replaced itself once it became clear it was also charging objectively unreasonable fees for RK&A services

93. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to PNC and Wells Fargo, in order to avoid paying unreasonable fees for RK&A services.

94. During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

95. During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

96. During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not have process in place to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RK&A services.

97. During the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

98. During the Class Period and because Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to PNC and Wells Fargo, the Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in this process.

99. During the Class Period and because Defendants did not regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to PNC and Wells Fargo, before and/or when paying fees for RK&A services, the Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RK&A services.

100.    During the Class Period and because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RK&A services to covered service providers, including but not limited to PNC and Wells Fargo, these RK&A service fees were significantly higher than they would have been had Defendants engaged in these efforts.

101.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RK&A fees illustrating that the Plan had on average 3,814 participants and paid an average effective annual RK&A fee of at least approximately $474,479, which equates to an average of at least approximately $124 per participant. These are the minimum amounts that could have been paid.

| Recordkeeping and Administration (RK&A) Fees | | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | *Average* |
| **Participants** | 2,847 | 3,003 | 2,866 | 5,124 | 5,231 | *3,814* |
| **Est. RK&A Fees** | $588,093 | $545,340 | $569,058 | $343,737 | $326,166 | *$474,479* |
| **Est. RK&A Per Participant** | $207 | $182 | $199 | $67 | $62 | *$124* |

102.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RK&A fees paid by other comparable Plans of similar sizes with similar amounts of money under management, compared to the average annual RK&A Fees paid by the Plan (as identified in the table above).

**Comparable Plans' RK&A Fees Based on Publicly Available Information from Form 5500 [1]**

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Brown Rudnick Llp 401K Profit Sharing Plan A | 508 | $100,407,634 | $29,785 | $59 | Schwab | White |
| Compass Health, Inc. 401(K) Profit Sharing Plan | 611 | $13,172,474 | $37,127 | $61 | Great-West | White |
| HRL Retirement Savings Plan For Non-Bargained Employees | 625 | $155,081,708 | $35,694 | $57 | Vanguard | White |
| The Taubman Company And Related Entities Employee Retirement Savings Plan | 679 | $144,649,416 | $49,446 | $73 | Vanguard | White |
| **Matthews Average Fee** | **3,814** | **$188,990,815** | **$474,479** | **$124** | **PNC and Wells Fargo** | **Red** |
| Hitachi Vantara Corporation Retirement And Savings Program | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity | White |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | White |
| St. Luke'S Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | White |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | White |
| Waste Connections, Inc. 401k Profit Sharing Plan | 7,923 | $332,567,264 | $455,853 | $58 | Voya | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

103.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RK&A fees paid by other comparable Plans of

similar sizes with similar amounts of money under management, compared to the average annual RK&A Fees paid by the Plan (as identified in the table above), with the white data points representing RK&A fees that RK&A providers offered to (and were accepted by) comparable Plans.



104. From the years 2014 to 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RK&A fee paid of at least $124 per participant for RK&A services.

105. From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan Fiduciary would have paid on average an effective annual RK&A fee of around $49 per participant, if not lower.

106.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $474,479 per year in RK&A fees, which equated to an effective average of approximately $124 per participant per year.

107.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar amounts of money under management, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RK&A services of approximately $186,896, per year in RK&A fees, which equates to approximately $49 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay more than double what they could otherwise pay for RK&A services.

108.    From the years 2014 through 2018 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $287,583 per year in RK&A fees, which equates to on average approximately $75 per participant per year.

109.    From the years 2014 to 2018, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants a total minimum amount of approximately $1,437,916 in unreasonable and excessive RK&A fees.

110. From the years 2014 to 2018 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other Plans of similar sizes with similar amounts of money under management, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,769,568 in RK&A fees.

111. During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees it paid to PNC and Wells Fargo.

112. During the entirety of the Class Period, and unlike a hypothetical prudent Fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to PNC or Wells Fargo vis-à-vis the fees that other RK&A providers would charge for the same services.

113. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's administrative costs and RK&A fees it paid to PNC or Wells Fargo, but Defendants simply failed to do so.

114. During the entirety of the Class Period and had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to PNC or Wells Fargo, it would have realized and understood that the Plan was compensating PNC or Wells Fargo unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and the Plan Participants. The fees were also excessive relative to the RK&A services received.

115.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher administrative costs and RK&A fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

116.    For all practical purposes there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, Plan Fiduciaries are required to engage investment consultants or advisors to the extent that the Plan Fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

117.    That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

118.    When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

119.    From the perspective of a Plan Participant, the other critical component of the analysis is the fees.  However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

120.    As a result, a Plan Fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RK&A services as well as the different fee components of the investment options selected to be made available to Plan

Participants.

121. Plan Fiduciaries of plans as large as the Defendant's Plan are deemed to be "Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

122. In fact, as "Institutional Investors," retirement Plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants, like Plaintiff.

123. For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans.

124. As a result, when a Plan Fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the Plan Fiduciary is required to understand all the fees related to the different share classes and choose the share class that is in the best interest of the Plan Participants. This is especially critical when the pricing structure provides compensation to the recordkeeper from revenue sharing paid by Plan Participants as part of the total expense ratio of the investment options selected by the Plan Fiduciaries.

125. If a Plan Fiduciary chooses an active investment option when an alternative index option is available, the Plan Fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

126. If a Plan Fiduciary chooses an active investment option when an alternative index

option is available, but the Plan Fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and warranting the higher fees charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants, the Plan Fiduciary has acted unreasonably and/or imprudently.

## THE PLAN PAID UNREASONABLY HIGH FEES FOR IMPRUDENT SHARE CLASSES

127.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets. There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

128.    As noted above, it is well known among Institutional Investors that mutual fund companies routinely waive investment minimums for large retirement plans. Moreover, large defined contribution plans such as the Plan have sufficient assets to qualify for most of the lowest cost share classes.

129.    So, unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes.  A prudent Plan Fiduciary ensures that the Plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors. The share class that provides the greatest benefit to plan participants is the share class that gives plan participants access to the portfolio managers at the lowest net fee for the services of the portfolio manager and is referred to as the "Net Investment Expense to Retirement Plans."

130.     As described in more detail below, choosing the share class that provides the lowest Net Investment Expense to Retirement Plans is always the prudent choice because, all else being equal, the use of the share class that provides the lowest Net Investment Expense to Retirement Plans will result in one of the following superior options: 1) The amount of the fee extraction to cover the RK&A fee will be lower; or 2) the amount of excess revenue being credited back to Participant accounts is greater.

131.     During the Class Period, Defendants knew or should have known that they are required to select the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

132.     During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

133.     During the Class Period, in many cases Defendants did not use share classes that provide the greatest benefit to plan participants and in some cases even switched from one share class to a different share class that charged a higher Net Investment Expense to Retirement Plans.

134.     During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

135.     The following chart identifies Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| AVFIX | American Beacon Small Cap Value I | 0.83% | 0.00% | 0.83% | AVPAX | American Beacon Small Cp Val Inv | 1.14% | 0.40% | 0.74% | 12% |
| BAGIX | Baird Aggregate Bond Inst | 0.30% | 0.00% | 0.30% | BAGSX | Baird Aggregate Bond Inv | 0.55% | 0.28% | 0.27% | 11% |
| CCALX | Conestoga Small Cap Institutional | 0.90% | 0.00% | 0.90% | CCASX | Conestoga Small Cap Investors | 1.10% | 0.40% | 0.70% | 29% |
| FTRFX | Federated Total Return Bond Fund | 0.69% | 0.30% | 0.39% | FTRBX | Federated Total Return Bond Instl | 0.39% | 0.10% | 0.29% | 34% |
| LCEFX | Invesco Diversified | 0.42% | 0.00% | 0.42% | DDFIX | Invesco Diversified Dividend R5 | 0.51% | 0.35% | 0.16% | 163% |
| MFEKX | MFS Growth R6 | 0.57% | 0.00% | 0.57% | MFEHX | MFS Growth R3 | 0.91% | 0.50% | 0.41% | 39% |
| PCBIX | Principal Midcap Fund | 0.69% | 0.10% | 0.59% | PEMGX | Principal MidCap A | 0.96% | 0.40% | 0.56% | 5% |
| PCBIX | Principal MidCap Institutional | 0.69% | 0.10% | 0.59% | PEMGX | Principal MidCap A | 0.96% | 0.40% | 0.56% | 5% |
| PAFDX | T. Rowe Price Equity Income Fund | 0.94% | 0.40% | 0.54% | PRFDX | T. Rowe Price Equity Income | 0.64% | 0.15% | 0.49% | 10% |
| TRSAX | T. Rowe Price Growth Stock Fund | 0.92% | 0.40% | 0.52% | PRGFX | T. Rowe Price Growth Stock | 0.65% | 0.15% | 0.50% | 4% |
| VINIX | Vanguard Institutional Index I | 0.04% | 0.00% | 0.04% | VIIIX | Vanguard Institutional Index Instl Pl | 0.02% | 0.00% | 0.02% | 75% |
| VIMAX | Vanguard MidCap Index Admiral | 0.05% | 0.00% | 0.05% | VMCPX | Vanguard Mid Cap Index InstitutionalPlus | 0.03% | 0.00% | 0.03% | 67% |
| VGSLX | Vanguard REIT Index | 0.12% | 0.00% | 0.12% | VGSNX | Vanguard Real Estate Index Institutional | 0.10% | 0.00% | 0.10% | 20% |
| VTIAX | Vanguard Total Intl Stock Index Admiral | 0.11% | 0.00% | 0.11% | VTISX | Vanguard Total Intl Stock Idx Instl Sel | 0.05% | 0.00% | 0.05% | 120% |
| | Average | 0.52% | 0.09% | 0.43% | | Average | 0.57% | 0.22% | 0.35% | 42.46% |

136.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by the Defendants' RK&A provider as well as the 408(b)(2) Fee Disclosure documents provided to the Defendant Plan by its service providers.

137.    Based upon data and information reflected in the charts above, the average excessive fee paid by participants during the Class Period as a result of Defendants' failure to use the prudent alternative share classes that provide the greatest benefit to plan participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, was

approximately 42.46%. There is no rational reason for a prudent Plan Fiduciary to choose an investment option that effectively charges a fee that is 42% higher than an alternative investment option that provides the identical services of the same portfolio manager.

138. During the Class Period, and had Defendants engaged in a prudent process to select the share class of a selected portfolio manager that provides the greatest benefit to plan participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, the Plan would not have selected the share classes listed in the "Defendants' Investment" column of the chart above.

139. During the Class Period, and had Defendants engaged in a prudent process, once a portfolio manager or passive index option had been selected, the Defendants would have selected the share classes listed in the "Prudent Alternative Share Class" column of the chart above.

140. During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, the Plan would not have selected the funds in the "Defendants' Investment" column in the chart above.

141. During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

142. During the Class Period, and had Defendants been acting in the best interests of the Plan's Participants, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

143. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

144. During the entirety of the Class Period, Defendants knew or should have known about the existence of alternative share classes of the same mutual funds currently selected and performed the analysis to determine the share class that provides the greatest benefit to Plan Participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, as identified in the "Prudent Alternative Share Class" column of the chart above.

145. During the entirety of the Class Period, Defendants knew or should have known to transfer the Plan funds into the share class that provides the greatest benefit to Plan Participants, i.e., the share class that provides the lowest Net Investment Expense to Retirement Plans, as identified in the "Prudent Alternative Share Class" column of the chart above.

146. A hypothetical Prudent Fiduciary would not select share classes that result in higher fees to Plan Participants when share classes that result in lower fees to Plan Participants are available for the identical portfolio management services.

147. During the entirety of the Class Period, Defendants selected share classes that resulted in higher fees to Plan Participants when share classes of the identical investment option were available that would have resulted in lower fees, to the substantial detriment of Plaintiff and the Plan's Participants.

148. During the entirety of the Class Period and because Defendants selected share classes that resulted in higher fees when share classes that resulted in lower fees were available to the Plan for the identical investment option, the Plaintiff and the Plan Participants did not receive any additional services or benefits other than a higher cost for Plaintiff and the Plan Participants.

149.     As an example of Defendants' failure to engage in an objectively reasonable search for, and selection of, the share class that provides the greatest benefit to Plan Participants and that was available to the Plan during the Class Period, consider the MFS Growth R6 (MFEKX) which was selected by the Plan Fiduciaries and made available to Plan Participants in the Plan from 2017 through at least 2018.

150.     As of December 31, 2017, Plan Participants had invested more than approximately $50,258,172 in this investment option. The portfolio managers of this investment option were Eric B. Fischman & Paul J. Gordon (Fischman & Gordon). Plan Participants can receive the identical portfolio management services of Fischman & Gordon through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Fischman & Gordon, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | | | | | |
|---|---|---|---|---|---|---|
| | MFS Growth R3 | MFS Growth R4 | MFS Growth R2 | MFS Growth I | MFS Growth R1 | MFS Growth R6 |
| Share Class | Class R3 | Class R4 | Class R2 | Class I | Class R1 | Class R6 |
| Investment Advisor | MFS | MFS | MFS | MFS | MFS | MFS |
| Portfolio Managers | Eric B. Fischman & Paul J. Gordon | Eric B. Fischman & Paul J. Gordon | Eric B. Fischman & Paul J. Gordon | Eric B. Fischman & Paul J. Gordon | Eric B. Fischman & Paul J. Gordon | Eric B. Fischman & Paul J. Gordon |
| Ticker | MFEHX | MFEJX | MEGRX | MFEIX | MFELX | MFEKX |
| Portfolio Management Fee | 0.54% | 0.54% | 0.54% | 0.54% | 0.54% | 0.54% |
| Total Expense Ratio | 0.91% | 0.66% | 1.16% | 0.66% | 1.66% | 0.57% |
| Revenue Sharing Credit | 0.50% | 0.15% | 0.65% | 0.10% | 1.10% | 0.00% |
| Net Investment Expense to Retirement Plans | 0.41% | 0.51% | 0.51% | 0.56% | 0.56% | 0.57% |

151.     The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by the

Defendants' RK&A provider as well as the 408(b)(2) Fee Disclosure documents provided to the Defendant Plan by its service providers.

152.    Because the underlying data and information reflected in the chart above were readily available to Defendants during the Class Period, Defendants did not need to "scour the market" when selecting and monitoring investment options for the Plan.

153.    In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RK&A (and in some cases other) services and is not disclosed to Plan Participants. As a result, a Plan Participant without this information would be unable to determine the actual cost of the portfolio management services.

154.    As a result, the fee paid for the portfolio management services of the portfolio managers Fischman & Gordon to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

155.    As illustrated in the chart above, the MFS Growth R3 (MFEHX) has the lowest "Net Investment Expense to Retirement Plans" at 0.42%.  Despite the Total Expense Ratio being higher, the MFS Growth R3 (MFEHX) provides the greatest benefit to Plan Participants because the 0.50% in revenue sharing that is allocable to RK&A services is a credit that can be returned to the participants directly or used as a credit against the RK&A fee. If the 0.50% allocable to RK&A services exceeds the actual RK&A fee, then the excess can also be returned to the Plan and its Participants.

156.    During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of Fischman & Gordon if invested in the MFS Growth R3 (MFEHX).

157.    When two identical service options are readily available (in this case the portfolio management services of Fischman & Gordon), and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent Plan Fiduciary ensures that the least expensive of those options is selected.

158.    A prudent Plan Fiduciary understands that the higher "sticker" price of the RK&A fee portion of the expense ratio, i.e., the 0.50%, is not relevant since, the RK&A service provider returns excess revenue to the Plan and Plan Participants.

159.    The DOL requires Plan Fiduciaries to understand all the fees related to all the various services provided to the Plan and its participants.  By selecting an investment option that charges more for identical portfolio management services, the Defendant Plan Fiduciaries breached their duty.

160.    As illustrated in the chart below, which is based on the $50,258,172 that the Plan invested in MFS Growth R6 (MFEKX) as of December 31, 2018, because Defendants did not select the share class that provided the greatest benefit to Plan Participants, i.e., the lowest Net Investment Expense to Retirement Plans, MFS Growth R3 (MFEHX), Defendants caused substantial monetary damage and detriment to Plaintiff and the Plan's Participants.



161. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period.

162. A hypothetical Prudent Fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, which would have identified and selected the share class that provides the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

163. A hypothetical Prudent Fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, would have identified the share class that provides the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

164.     During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on at least a quarterly basis; 2) did not identify the prudent share classes available to the Plan; 3) did not transfer the Plan's investments into these prudent share classes at the earliest opportunity; and 4) actually transferred participants' assets from the share classes that provide the lowest Net Investment Expense to Retirement Plans to more expensive share classes, all to the substantial detriment of Plaintiff and the Plan's Participants.

165.     During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants through 2018 in the amount of approximately $251,079 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Net Investment Expense to Retirement Plans | $441,335 | $451,823 | $484,070 | $1,403,187 | $1,204,104 |
| Prudent Alternative Share Class | | | | | |
| Net Investment Expense to Retirement Plans | $429,844 | $440,344 | $463,601 | $1,349,483 | $1,058,349 |
| Est. Investment Damages | $11,491 | $11,479 | $20,469 | $53,704 | $145,754 |
| Compounding Percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% |
| Est. Cumulative Investment Damages | $11,491 | $23,130 | $46,363 | $110,183 | $251,079 |

166.     During the entirety of the Class Period and by failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower fees to retirement plan participants were available for the same investment and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to

Plaintiff and the Plan Participants.

## DEFENDANTS' INVESTMENTS IN THE PLAN

167.    A hypothetical prudent Fiduciary will consider all Plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts §100 cmt. b(1).

168.    While higher-cost mutual funds may outperform a less-expensive option over the short term, such as a passively managed index fund, they rarely do so over a longer term. See Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); see also *Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

169.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

170.    During the Class Period, the chart below identifies several investment options that

Defendants selected and/or made available to Plan Participants as compared to prudent alternative and less expensive options.

| | Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AVFIX | American Beacon Small Cap Value I | 0.83% | 0.00% | 0.83% | VSIIX | Vanguard Small Cap Value Index I | 0.06% | 0.00% | 0.06% | 1283% |
| AVUAX | American Century Mid Cap Value Inst | 0.78% | 0.15% | 0.63% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 0.00% | 0.07% | 800% |
| RERGX | American Funds Europacific Growth R6 | 0.49% | 0.00% | 0.49% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 0.00% | 0.25% | 96% |
| RFTTX | American Funds Trgt Date Ret 2010 R6 | 0.31% | 0.00% | 0.31% | VTINX | Vanguard Target Retirement Income Inv | 0.12% | 0.00% | 0.12% | 158% |
| RFJTX | American Funds Trgt Date Ret 2015 R6 | 0.31% | 0.00% | 0.31% | VTXVX | Vanguard Target Retirement 2015 Inv | 0.13% | 0.00% | 0.13% | 138% |
| RRCTX | American Funds Trgt Date Ret 2020 R6 | 0.31% | 0.00% | 0.31% | VTWNX | Vanguard Target Retirement 2020 Inv | 0.13% | 0.00% | 0.13% | 138% |
| RFDTX | American Funds Trgt Date Ret 2025 R6 | 0.33% | 0.00% | 0.33% | VTTVX | Vanguard Target Retirement 2025 Inv | 0.13% | 0.00% | 0.13% | 154% |
| RFETX | American Funds Trgt Date Ret 2030 R6 | 0.35% | 0.00% | 0.35% | VTHRX | Vanguard Target Retirement 2030 Inv | 0.14% | 0.00% | 0.14% | 150% |
| RFFTX | American Funds Trgt Date Ret 2035 R6 | 0.37% | 0.00% | 0.37% | VTTHX | Vanguard Target Retirement 2035 Inv | 0.14% | 0.00% | 0.14% | 164% |
| RFGTX | American Funds Trgt Date Ret 2040 R6 | 0.38% | 0.00% | 0.38% | VFORX | Vanguard Target Retirement 2040 Inv | 0.14% | 0.00% | 0.14% | 171% |
| RFHTX | American Funds Trgt Date Ret 2045 R6 | 0.38% | 0.00% | 0.38% | VTIVX | Vanguard Target Retirement 2045 Inv | 0.15% | 0.00% | 0.15% | 153% |
| RFITX | American Funds Trgt Date Ret 2050 R6 | 0.39% | 0.00% | 0.39% | VFIFX | Vanguard Target Retirement 2050 Inv | 0.15% | 0.00% | 0.15% | 160% |
| RFKTX | American Funds Trgt Date Ret 2055 R6 | 0.40% | 0.00% | 0.40% | VFFVX | Vanguard Target Retirement 2055 Inv | 0.15% | 0.00% | 0.15% | 167% |
| RFUTX | American Funds Trgt Date Ret 2060 R6 | 0.41% | 0.00% | 0.41% | VTTSX | Vanguard Target Retirement 2060 Inv | 0.15% | 0.00% | 0.15% | 173% |
| BAGIX | Baird Aggregate Bond Inst | 0.30% | 0.00% | 0.30% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 0.00% | 0.03% | 1100% |
| CCALX | Conestoga Small Cap Institutional | 0.90% | 0.00% | 0.90% | VSGIX | Vanguard Small Cap Growth Index I | 0.06% | 0.00% | 0.06% | 1400% |
| FMDCX | Federated Mid-Cap Index Fund | 0.57% | 0.30% | 0.27% | FSMDX | Fidelity® Mid Cap Index Instl Prem | 0.03% | 0.00% | 0.03% | 980% |
| FTRFX | Federated Total Return Bond Fund | 0.69% | 0.30% | 0.39% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 0.00% | 0.03% | 1460% |
| FDVIX | Fidelity Adviser Diversified International Fund | 0.92% | 0.35% | 0.57% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 0.00% | 0.25% | 128% |

| | Defendants' Investment *(continued)* | | | | | Prudent Alternative Investments *(continued)* | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| LCEFX | Invesco Diversified | 0.42% | 0.00% | 0.42% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 0.00% | 0.04% | 1100% |
| MFEKX | MFS Growth R6 | 0.57% | 0.00% | 0.57% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1529% |
| PCBIX | Principal Midcap Fund | 0.69% | 0.10% | 0.59% | VMGMX | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 0.00% | 0.07% | 743% |
| PCBIX | Principal MidCap Institutional | 0.69% | 0.10% | 0.59% | VMGMX | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 0.00% | 0.07% | 743% |
| PAFDX | T. Rowe Price Equity Income Fund | 0.94% | 0.40% | 0.54% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 0.00% | 0.04% | 1443% |
| TRSAX | T. Rowe Price Growth Stock Fund | 0.92% | 0.40% | 0.52% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1386% |
| PARAX | T. Rowe Price Retirement 2010 Advisor | 0.77% | 0.40% | 0.37% | VTINX | Vanguard Target Retirement Income Inv | 0.12% | 0.00% | 0.12% | 208% |
| PARBX | T. Rowe Price Retirement 2020 Advisor | 0.83% | 0.40% | 0.43% | VTWNX | Vanguard Target Retirement 2020 Inv | 0.13% | 0.00% | 0.13% | 231% |
| PARCX | T. Rowe Price Retirement 2030 Advisor | 0.90% | 0.40% | 0.50% | VTHRX | Vanguard Target Retirement 2030 Inv | 0.14% | 0.00% | 0.14% | 257% |
| PARDX | T. Rowe Price Retirement 2040 Advisor | 0.95% | 0.40% | 0.55% | VFORX | Vanguard Target Retirement 2040 Inv | 0.14% | 0.00% | 0.14% | 293% |
| PARFX | T. Rowe Price Retirement 2050 Advisor | 0.96% | 0.40% | 0.56% | VFIFX | Vanguard Target Retirement 2050 Inv | 0.15% | 0.00% | 0.15% | 273% |
| TRRYX | T. Rowe Price Retirement 2060 Advisor | 0.96% | 0.40% | 0.56% | VTTSX | Vanguard Target Retirement 2060 Inv | 0.15% | 0.00% | 0.15% | 273% |
| VINIX | Vanguard Institutional Index I | 0.04% | 0.00% | 0.04% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 133% |
| VIMAX | Vanguard MidCap Index Admiral | 0.05% | 0.00% | 0.05% | FSMDX | Fidelity® Mid Cap Index Instl Prem | 0.03% | 0.00% | 0.03% | 100% |
| VGSLX | Vanguard REIT Index | 0.12% | 0.00% | 0.12% | FSRNX | Fidelity® Real Estate Index Instl | 0.07% | 0.00% | 0.07% | 71% |
| VTIAX | Vanguard Total Intl Stock Index Admiral | 0.11% | 0.00% | 0.11% | FSPSX | Fidelity® International Index InstlPrm | 0.04% | 0.00% | 0.04% | 214% |
| | *Average* | *0.55%* | *0.13%* | *0.42%* | | *Average* | *0.10%* | *0.00%* | *0.10%* | *513.52%* |

171.     The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by the

Defendants' RK&A provider as well as the §408(b)(2) Fee Disclosure documents provided to the Defendant Plan by its service providers.

172.    In the charts above, the "expense ratio" refers to a percentage of the Plan's assets that were under management during the Class Period. For example, if a mutual fund share class deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (or bps). (One basis point is equal to 1/100th of one percent (or 0.01%)). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.  Conversely, any revenue sharing that is credited back to participants increases the total value of Participants' accounts.

173.    During the Class Period and based on the charts above, the average Net Investment Expense to Retirement Plans of the investments selected and made available to Plan Participants by the Plan Fiduciaries identified above was 0.42%, or 42 basis points.

174.    During the Class Period and based on the charts above, the investment options selected by the Plan Fiduciaries were 514% more expensive than prudent alternative and less expensive options covering the same asset category.

175.    A hypothetical prudent Fiduciary understands and knows that a fund's total expense ratio, revenue sharing rate, and the resulting Net Investment Expense to Retirement Plans are some of the most important (if not the most important) considerations in the fund selection process.

176.    During the Class Period, Defendants knew or should have known that a fund's total expense ratio, revenue sharing rate, and the resulting Net Investment Expense to Retirement Plans are some of the most important (if not the most important) considerations in the fund selection process.

177.    A hypothetical prudent Fiduciary would only choose an active investment option

when an alternative index option is available if that same hypothetical prudent Fiduciary made a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

178.    During the Class Period, the Defendants did not make a specific and informed finding, as part of a prudent investment selection process, that that the probability that the active portfolio manager will outperform the index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

179.    During the Class Period, and because Defendants did not engage in an objectively reasonable process when selecting funds for the Plan, Defendants selected the funds identified in the "Defendants' Investment" column in the charts above.

180.    During the Class Period, and had Defendants engaged in an objectively reasonable process when selecting funds for the Plan, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

181.    During the Class Period, and had Defendants been acting in the best interests of the Plan's Participants, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

182.    During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected funds with lower Net Investment Expense to Retirement Plans than those funds actually selected by Defendants as identified in the "Defendants' Investment" column in the charts above.

183.    During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected the investment options identified in the "Prudent Alternative Investments" column in the chart above.

184.    During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting and regularly monitoring investments to ensure that the investments remained prudent selections.

185.    During the Class Period, Plaintiff did not know the RK&A fee structure, or the revenue sharing rates associated with the investments selected by the Defendants.

186.    During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with PNC and Wells Fargo, thereby paying fees that were more than necessary to the detriment of Plaintiff and the Plan's Participants.

187.    During the Class Period and had Defendants chosen investment options similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, the Plan's Participants would have been received virtually identical portfolio management services at a lower cost.  Any differences in the portfolio management services delivered by the Investments selected by Defendants do not warrant the additional fees and were therefore imprudent.

188.    During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, Defendants' caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's Participants.

189. During the Class Period, Defendants failed to consider materially similar and less expensive alternatives to the Plan's investment options. The chart above demonstrates that both the expense ratios and the Net Investment Expense to Retirement Plans of the Plan's investment options between the years 2014 to 2020 were more expensive by significant multiples of comparable passively managed and actively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

190. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of funds identified in the "Defendants' Investment" column in the charts above, Plaintiff and the Plan's Participants incurred actual expenses and costs as identified in the "Actual Investment Lineup" portion of the chart below.

191. During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives as identified in the "Alternative Investment Lineup" portion of the chart below.

192. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's Participants in the amount of approximately $2,342,659 through 2018 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Net Investment Expense to Retirement Plans | $441,335 | $451,823 | $484,070 | $1,403,187 | $1,204,104 |

| Prudent Alternative Investments | | | | | |
| --- | --- | --- | --- | --- | --- |
| Net Investment Expense to Retirement Plans | $187,656 | $192,568 | $209,187 | $842,909 | $390,383 |
| | | | | | |
| Est. Investment Damages | $253,678 | $259,254 | $274,883 | $560,278 | $813,721 |
| Compounding Percentage (VIIIX) | | 1.39% | 11.95% | 21.82% | -4.41% |
| Est. Cumulative Investment Damages | $253,678 | $516,459 | $853,059 | $1,599,475 | $2,342,659 |

193.    During the entirety of the Class Period, and by failing to engage in an objectively reasonable investigation process when selecting its investments as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

194.    Defendants were required to independently assess "the prudence of each investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423. Defendants were also required to remove investments that were no longer prudent for the Plan, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

195.    Defendants did not independently assess the prudence of the Plan's investment options on an ongoing basis and did not remove investments that were no longer prudent for the Plan, thereby breaching their fiduciary duties to Plaintiff and the Plan Participants.

## FAILURE TO FULLY DISCLOSE FEES CHARGED OR CREDITED TO THE PLAN INVESTMENTS

196.    ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant

thereto, to make informed decisions with regard to the management of their individual accounts" 29 C.F.R. §2550-404a-5(a).

197.    In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate." 29 C.F.R. §2550- 404a-5(b)-(d).

198.    Defendants failed to properly disclose the fees charged to Participants in the Plan in their quarterly statements and participant fee disclosure documents.

199.    Several of the Plan's participant fee disclosure documents specifically state that "[s]ome of the plan's administrative expenses for the preceding quarter may have been paid from the total annual operating expenses of one or more of the plan's designated investment alternatives." Through this notice the Defendant acknowledges that it is receiving revenue sharing as part of its RK&A fees.

200.    As a result, plan participants are not able to determine how much they actually paid for the RK&A services provided by the Defendants' recordkeepers.

201.    Moreover, at least one of the Defendants' recordkeepers explicitly states in its Fee Disclosure to the Defendants:

> Wells Fargo will rebate to your Plan's Trust revenue sharing amounts (e.g., sub-transfer agency fees and shareholder servicing fees), as reflected in the Fees Paid by Fund (included in the NAV) column, received pursuant to revenue sharing arrangements between Wells Fargo and the proprietary and nonproprietary mutual funds and CIFs listed above ("Revenue Sharing"). Wells Fargo receives these

Revenue Sharing amounts for the provision or recordkeeping and other administrative services to the Plan ....

202.    Upon information and belief, the Defendants failed to disclose the revenue sharing rates of each investment option to the Participants.

203.    As a result, the Participants were unable to determine the actual Net Investment Expense paid by Plan Participants for each of their investment options.

204.    Moreover, some of the investment options in the Plan have different revenue sharing rates than others and some even had no revenue sharing at all.

205.    The Defendant's recordkeeper was providing at least some portion of the revenue sharing back to the Plan.  As a result, each participant's contribution to the RK&A fees varied based on their selection of specific designated investment alternatives.  Without knowing the portion of the expense ratio allocable to the RK&A services received by the Participants, each Participant could not make "informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a-5(a).

206.    The Defendants' failure to disclose the revenue sharing rates associated with each investment option prevented Participants from making "informed decisions with regard to the management of their individual accounts." 29 C.F.R. §2550-404a-5(a).

207.    For example, if it is critical for a Participant to know the total expense ratio and performance history in order to make an informed investment decision, then it is also critical to know the amount of any credits that could be returned to Participants or could be used to pay for the Plan's administrative expenses.  When a rebate is available to reduce the "sticker" price of a product or service, the failure to provide the amount of the rebate prevents a buyer from understanding the net cost of the product or service.  It is obvious a prudent buyer of the product or service would need to know whether rebates were available and, if so, the amount of the rebate.

208. The Defendants' incomplete and ambiguous disclosures are a clear violation of the ERISA disclosure requirements imposed on all Plan administrators and are also evidence that the Defendants were imprudent in the administration of the Plan.

209. Plaintiffs have been harmed by the Defendants' failure to abide by the requirement to disclose all the information a Participant would need to make an informed investment decision.

210. The failure to disclose all the information a Participant would need to make an informed investment decision, as required under 29 C.F.R. §2550-404a-5(a), breached the fiduciary obligations of prudence and loyalty that Defendants owed to Plaintiffs and members of the Class.

## CLASS ACTION ALLEGATIONS

211. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

212. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Matthews International Corporation 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning six years before the commencement of this action and running through the date of judgment.

213. The Class includes more than 6,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

214. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the

actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

215. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

216. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

217. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

218.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

219.     Plaintiff's attorney is experienced in complex ERISA and class litigation and will adequately represent the Class.

220.     The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

221.     Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

222.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
## Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
## (Plaintiff, on behalf of himself and Class – RK&A Fees)

223.    Plaintiff restates the above allegations as if fully set forth herein.

224.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

225.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

226.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

227.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

228.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: ensure that the Plan's RK&A fees were reasonable, properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

229.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

230. During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

231. Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A).

232. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

233. As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

234. Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

## SECOND CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class – Investment Management Fees)

235. Plaintiff restates the above allegations as if fully set forth herein.

236. Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

237.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in managing the investments of the Plan.

238.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment and share class options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

239.    During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

240.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, properly disclose the fees charged to Participants in the Plan in their quarterly statements and fee disclosures, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

241.    Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments and share classes were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

242.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

243.     Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, for properly disclosing the fees charged to Participants in the Plan in their quarterly statements and fee disclosures, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

244.     Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

245.     Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A).

246.     Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

247.     As a result of Defendants' breach of their fiduciary duties of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

248.     Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made

through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

## THIRD CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### <u>(Plaintiff, on behalf of himself and Class – RK&A Fees)</u>

249. Plaintiff restates the above allegations as if fully set forth herein.

250. Defendants had the authority to appoint and remove members or individuals responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

251. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

252. Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

253. Defendants breached their fiduciary duties by, among other things:

      a.      Failing to monitor and evaluate the performance of individuals responsible for Plan RK&A fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RK&A expenses;

b.     Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers; and

c.     Failing to remove individuals responsible for Plan RK&A fees whose performance was inadequate in that these individuals continued to pay the same RK&A costs even though benchmarking and using other similar comparators would have showed that maintaining PNC and Wells Fargo as record keepers was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

254.     As the consequences of the foregoing breaches of the duty to monitor for RK&A fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

255.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RK&A fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**<u>(Plaintiff, on behalf of himself and Class – Investment Management Fees)</u>**

256.     Plaintiff restates the above allegations as if fully set forth herein.

257.     Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

258.     In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their

fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

259.    Defendants had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

260.    Defendants breached their fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of fund's class of shares, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

b.    Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

c.    Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

261.     As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

262.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.      An Order requiring Defendant Matthews International to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Matthews International as necessary to effectuate relief, and to prevent Matthews International's unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the
        common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

        Dated this 25th day of September, 2020

                                        WALCHESKE & LUZI, LLC
                                        Counsel for Plaintiff

                                        s/ *Paul M. Secunda*
                                        James A. Walcheske, State Bar No. 1065635
                                        Scott S. Luzi, State Bar No. 1067405
                                        Paul M. Secunda, State Bar No. 1074127

WALCHESKE & LUZI, LLC
15850 W. Bluemound Rd., Suite 304
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com